# In the United States Court of Federal Claims

No. 10-359T
(Filed: May 28, 2015)

* * * * * * * * * * * * * * * * * *

SCOTT B. GANN,

                 *Plaintiff*,

v.

THE UNITED STATES,

                 *Defendant*.

Employee withholding; Trust fund taxes; 26 U.S.C. § 6672; Failure to pay over; Responsible person; Willfulness.

* * * * * * * * * * * * * * * * * * *

    *Kerry L. Pedigo*, Dallas, TX, for plaintiff.

    *Jennifer D. Spriggs*, Tax Division, United States Department of Justice, Washington, DC, with whom were *Caroline D. Ciraolo*, Acting Assistant Attorney General, *David I. Pincus*, Chief, Court of Federal Claims Section, *G. Robson Stewart*, Assistant Chief, for defendant.

## OPINION

BRUGGINK, Judge.

    Pending in this tax refund suit is defendant's motion for summary judgment. Defendant argues that it is entitled to judgment as a matter of law because the undisputed facts establish plaintiff's legal liability for failing to remit income and social security taxes withheld from the pay of employees of a corporation over which plaintiff had de facto control. Plaintiff opposes the motion, arguing that he was neither in control of the operations of the company nor did he willfully shirk any responsibility to pay those taxes. Oral argument is deemed unnecessary. We grant defendant's motion in part and deny it in part as explained below.

<u>BACKGROUND</u>[1]

I.  Legal Framework And Procedural History

The Internal Revenue Code ("IRC") requires employers to withhold income and social security taxes from employee wages and to submit those monies to the Internal Revenue Service ("IRS") on behalf of the employees. *See* 26 U.S.C. §§ 3102(a), 3402(a) (2012).   In essence, the law requires employers to collect and hold these funds in trust for the government. *See* 26 U.S.C. § 7501 (2012) ("the amount of tax collected or withheld shall be held to be a special fund in trust for the United States").   If an employer fails to remit these funds to the IRS, the employee is generally credited with having paid the taxes anyway. *See Slodov v. United States*, 436 U.S. 238, 243 (1978). The employer naturally remains liable.   Section 6672 of the IRC provides an additional protection for the government: personal liability on the part of those who were responsible for failing to remit the withheld funds to the government.   26 U.S.C. § 6672 (2012).   "Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such a tax . . . and pay over such tax . . . shall . . . be liable to a penalty equal to the total amount of the tax evaded." *Id.*

The IRS levied a section 6672 penalty on plaintiff, Scott Gann, for failing to pay over the trust fund taxes withheld from employees of Humanity Capital, Inc. ("HCI") for the tax quarters that ended on June 30, 2005, through September 30, 2007.   The total amount assessed against plaintiff was $699,690.33 plus statutory interest. *See* Def.'s Exs. 1-11.

Mr. Gann made a partial payment of $467.00 for the first quarter of 2007, and, on February 9, 2010, filed a claim for refund of that amount and abatement of the remaining amount assessed against him.   That request was denied by a letter dated May 21, 2010.   Def.'s Ex. 51.   Plaintiff filed suit for the same relief in this court on July 10, 2010.   Defendant has counterclaimed for an amount equal to the balance of the assessed penalty plus accrued statutory interest.   The parties have completed discovery, and defendant now asks the court to hold that plaintiff was responsible for HCI's failure to pay those taxes to the IRS and that he willfully chose not to pay them.   Plaintiff opposes the motion.

---

[1] The facts in this background section are drawn from the parties' briefs and exhibits attached thereto.   All the facts are undisputed except where noted.

II.  Factual History

Scott Gann has worked in the financial sector since 1992, both on Wall Street and in Houston, Texas.  Currently he runs a hedge fund, OSO Capital, which he started in 2008.  During the period in question, he was employed by an investment banking firm in Houston as a managing director.  In 2005, he funded the start up of HCI, a temporary staffing company in the Dallas, Texas area.  HCI was formally incorporated on February 7, 2005.  Def.'s Ex. 33 (Articles of Incorporation).  Mr. Gann was listed as its only director at founding.  *Id.* at A181.[2]  He was, however, upon the express prohibition of his then-employer, not an executive of HCI and did not run its day-to-day operations.  At its founding and for the duration of its life, HCI's daily operations were overseen by its president and CEO, Mimbi Robertson.[3]

Ms. Robertson was a prior acquaintance of plaintiff, and plaintiff testified that she approached him with the idea of starting a staffing company.  Ms. Robertson already had 15 years of experience in the staffing industry, including 10 very successful years as an account executive and eventually a regional manager at another staffing company.  *See* Def.'s Ex 38 (Tabatha IV SEC Form 8-K).  Owing to her experience, plaintiff agreed to fund the new venture as the principal shareholder.  Ms. Robertson was promised 10 percent of HCI, by stock grant, should the business succeed and a market for its stock develop.  Pl.'s Ex A at A4 (Decl. of Scott Gann).  There is much disagreement between the parties as to how much independent control was exercised by Ms. Robertson, but it is undisputed that she was listed as the CEO and president of

_____

[2] Initially, plaintiff's wife, Camille Gann, was the sole shareholder of HCI.  That was in order to give time for Mr. Gann to gain approval from his then-employer to invest in the company.  The shares were later conveyed from Mrs. Gann to Mr. Gann.  In May 2005, HCI became a wholly-owned subsidiary of Tabatha IV, Inc., a public company.  As a part of that reorganization, Mr. Gann was issued all of the company's common stock.  On January 16, 2006, Tabatha IV was renamed Human Capital Holding Corporation.  We will refer to all of these entities collectively as "HCI" unless specifically mentioned otherwise.

[3] Ms. Robertson was later married, and her named changed to Mimbi Cohen.  We refer to her as "Ms. Robertson" as she was known at the time of the events in question.

HCI in all of its SEC filings and represented herself as such when conducting business on behalf of HCI.

Mr. Gann also hired Charlie Dickerson as CFO of HCI. He is a certified public accountant, and, at the time of his hiring, had more than 20 years of accounting experience, including a position as Director of Finance and Acquisition at a national staffing company. Def.'s Ex. 38 at A216. Mr. Dickerson reviewed HCI's books to make sure that each transaction was recorded on a daily basis, consulted on operational issues, prepared SEC filings, maintained financial records, and provided input on general financial matters to Mr. Gann and Ms. Robertson. *See* Def.'s Ex. 49 at A495-96 (Dep.. of Charlie Dickerson). Mr. Dickerson and Ms. Robertson also served on the board of directors of the holding company after its acquisition of HCI. *See id.* at A198. Mr. Dickerson, however, did not have any financial stake in HCI or the holding company at any time.

HCI employed approximately nine other permanent office staff and, at its peak, approximately 400 temporary employees who were contracted out to other companies. From its inception, HCI used separate bank accounts for the payroll of temporary workers and permanent office staff. Payroll taxes for permanent employees are not at issue.

Because HCI was a new business and had no credit history of its own, plaintiff signed the office space lease for HCI, Def.'s Ex. 29, paid workers' compensation insurance premiums directly, opened bank accounts, guaranteed loans, and leased vans for HCI. *See* Def.'s Ex. 46 at A336-37, A375-76. Defendant presents the court with the 2005 agreements for eight HCI checking accounts at Sovereign Bank in Dallas. These reflect that plaintiff was the sole authorized signer for two of those accounts (earmarked for taxes and bills). *See* Def.'s Ex. 27 (Sovereign Bank initial account agreements).[4] He was listed as an authorized signer along with Ms. Robertson for the other six accounts.

---

[4]On several of the initial account agreements, plaintiff is listed as "principal" and, in one instance, as "president" of HCI. Def.'s Ex. 27 at A91, A95, A103, A107, A111. On the others, he is listed, along with Ms. Robertson, as an "authorised signer." Mr. Gann testified at deposition that these were clerical errors and that he should have been listed as the chairman of the board and not as an executive or principal of HCI. Def.'s Ex. 46 at A364-73 (Dep. of Scott Gann).

Plaintiff likewise signed several signature cards, along with Ms. Robertson, opening several commercial checking accounts for HCI at JP Morgan Chase Bank in 2007.  *See* Def.'s Exs. 23-24.  These accounts were earmarked for temporary payroll, tax deposits, permanent payroll, and general operating.  Plaintiff is also listed on several internal bank documents relating to these accounts, business depository resolutions, as a "principal."  Def.'s Ex. 24 at A79, A82, A84.  On the signature cards, however, a handwritten annotation appears, crossing out the word "principal" and writing over top of it the word "chairman," Def.'s Ex. 23; Def.'s Ex. 24 at A80-81, A83, A85.  Mr. Gann testified that he did not write the word "chairman" and did not know who did.  Def.'s Ex. 46 at A351-56.

Plaintiff also executed a certificate of deposit signature card on behalf of HCI for a $25,000 deposit at Sovereign Bank, dated August 7, 2005.  Def.'s Ex. 28 at A129-30.  Mr. Gann similarly executed, as the sole signer and "principal," a promissory note with Sovereign Bank for a $36,182 loan to HCI.  *Id.* at A136-38.  In connection with that loan, he executed a corporate resolution allowing him to borrow on behalf of HCI.  *Id.* at A140-41.  He signed that document twice, once as a "principal" and once as the "president" of HCI.  Plaintiff also signed a commercial guaranty in connection with that note and a commercial security agreement as a principal of HCI.  *Id.* at A142-44, 145-149.  Lastly, he signed a Landlord's Release and Consent as a borrower in connection with that same loan.  Def.'s Ex. 26.  He signed that document as a "principal" of HCI.  *Id.* at A88.

During 2005 and 2006, plaintiff regularly signed payroll checks for permanent and temporary employees.  He also signed checks to meet the various other obligations of HCI.  In total, Mr. Gann signed 2508 checks on behalf of HCI, drawing from six accounts at Sovereign Bank in Dallas.  Jt. Ex. 50 (joint stipulation regarding checks signed by plaintiff).  He stopped regularly signing HCI's checks in 2006 because it occupied too much time.  Pl.'s Ex. A at A5 (Decl. of Scott Gann).

Mr. Gann stated that he signed these checks at Ms. Robertson's behest because she thought it would be a good way for him to become familiar with the business.  *Id.*  He explained that he did not prepare any of the checks nor decide who would be paid at what time.  *Id.*  Ms. Robertson's recollection is different, however.  She stated in a 2014 declaration that "Mr. Gann controlled all of the company's financial decisions," and further explained that plaintiff instructed HCI's accounting team "every Friday . . . what bills were to be paid and how much was to be paid."  Def.'s Ex. 45 at A319 (Decl. of Mimbi

(Robertson) Cohen).  This contrasts with an earlier affidavit signed by Ms. Robertson attached to plaintiff's complaint.  In that 2008 affidavit, Ms. Robertson stated that, as CEO of HCI, she was "responsible for making and executing all financial decisions, including receiving, reviewing and approving invoicing, the maintenance of the Company's banking accounts, and the actual paying of bills and signing of checks/drafts."  Pl.'s Ex. G.  She further stated that she alone had handled those duties since January 2006.

In a declaration submitted in support of plaintiff's opposition to the motion for summary judgment, Mr. Dickerson stated that he reviewed the 2008 affidavit of Ms. Robertson and agreed with her representations therein: that Ms. Robertson was responsible for daily operations and decisions made at HCI.  Pl.'s Ex. B at A16.  Mr. Dickerson testified at his deposition that he provided advise to Ms. Robertson regarding the operation of HCI because of his history in the industry.  Def.'s Ex. 49 at A496.  He described his role in this regard as a "sounding board" for Ms. Robertson.  *Id.*  He was asked who had the final say regarding operations at HCI.  He answered that, at least in some instances, Ms. Robertson would make the decisions, even over the objection of others.  *Id.* at A497.  "[T]here certainly were times she would advise [Mr. Gann] on what . . . she wanted to do and whether it was persuasive or jointly agreed to, [it] would be done."  *Id.*  He summarized, however, by saying that the final say varied depending on the issue or subject matter.  *Id.*

An independent auditor, Bill Huff, was deposed regarding a 2005 audit he and his firm performed on HCI.  Mr. Huff dealt primarily with Mr. Dickerson at HCI during the audit and did not have any contact with Ms. Robertson while there.  *See* Def.'s Ex. A467 (Dep. of Bill Huff).  He testified that he recalled having one conversation with Mr. Gann regarding HCI's nonpayment of payroll taxes.  *Id.* at A473.  He and his firm did not involve themselves in the day-to-day operations of HCI because they were tasked with performing an independent audit.  *Id.* at A466-67.  He nonetheless provided an opinion regarding who ran HCI when asked by defendant at his deposition.  It was his opinion that Scott Gann ran HCI and that he made most of the ultimate decisions for the company.  *Id.* at A474-75.

HCI was never profitable.  As early as June 30, 2005, it reported a significant net operating deficit.  *See* Def.'s Ex. 35 (June 30, 2006 HCI Consolidated Balance Sheet).  The company was dependent upon a series of cash infusions from plaintiff, which eventually totaled approximately $700,000.  Those loans were not repaid, with the exception of one $13,000 bridge loan that was repaid within two days in August 2007. Def.'s Ex. 46 at

6

A357 (Def.'s excerpts of Gann Dep.).

From its inception, HCI did not remit withheld payroll taxes to the IRS for its temporary employees. Quarterly tax returns for the second and third quarters of 2005 show payroll taxes owed in the amounts of $27,466.88 and $32,6999.44 respectively. Def.'s Exs. 12-13. Mr. Gann stated that he first became aware of these deficiencies in November 2005 when Ms. Robertson came to his office and showed him a notice from the IRS. Pl.'s Ex. A at A5 (Gann Decl.). Mr. Gann, after consultation with Mr. Dickerson, contacted the IRS soon thereafter to discuss the liability. Ms. Robertson's 2014 declaration reflects that she attended meetings with Mr. Gann and Mr. Dickerson during that first year concerning the taxes but played no role in the decisions made regarding them. Def.'s Ex. 45 at A318-19. Mr. Dickerson testified that he took the lead in resolving the tax problem in 2005 and that he discussed the issue with both plaintiff and Ms. Robertson. *See* Def.'s Ex. 49 at A498-501.

The result of their efforts in late 2005 was an agreement with the IRS by which HCI would make installment payments to catch up on its payroll taxes and would keep current on its ongoing withholding obligations. *See* Pl.'s Ex. B. at A15 (Dickerson Decl.). After that agreement was reached, Mr. Dickerson believed that HCI was keeping current on its ongoing payroll taxes. Then, "at some point," he became aware that HCI was not meeting its agreed upon installment payments, *id.* at A16, nor remitting the subsequently withheld amounts. Things came to a head in February 2007 when an IRS agent visited HCI unannounced and informed both Mr. Dickerson and plaintiff that HCI had not kept current on its payroll taxes. *See id.*

Plaintiff testified that he had no idea that the taxes were not being paid because he was "pumping money into the company" to meet its regular expenses. Def.'s Ex. 46 at A346. He further testified that he would ask Ms. Robertson about the status of the taxes, but he did not hold regular meetings to discuss the issue. *Id.* at 347. Other than signing three checks to the IRS in February, March, and May 2006 after the initial installment agreement was reached, Mr. Gann did not deal directly with the IRS again until 2007. He testified that he was not made aware of HCI's continuing failure to remit withheld taxes and assumed that HCI was keeping current. Pl.'s Ex. A7-8. Both Mr. Dickerson and plaintiff testified that it was Ms. Robertson's ultimate responsibility to ensure that HCI paid its taxes. She signed each of the quarterly tax returns for HCI. The record is not clear as to why HCI did not meet its withholding obligations other than the obvious problem of operating at a loss.

7

HCI's holding company's annual SEC disclosure for the fiscal year ended June 30, 2005, reported a payroll tax liability in the amount of $74,119. Def.'s Ex. 44 at A289 (Tabatha IV's SEC Form 10-K).  Subsequent SEC filings through the first quarter of 2006 disclosed no additional withholding liabilities.  *See* Def.'s Exs. 40, 41.  No further SEC disclosures were filed for HCI's holding company.  HCI's Consolidated Balance Sheet through June 30, 2006, indicated a payroll tax liability of $426,260, Def.'s Ex. 35 at A183, but also noted that HCI had ceased operations as of September 14, 2007, *id.* at A191.  The actual date of this document is not clear; it states only that it was current through June 30, 2006, but included information about the closing of HCI in 2007.  Thus, even assuming that Mr. Gann reviewed this document, it is still unclear whether this is evidence of Mr. Gann's awareness of HCI's continuing failure to pay its payroll taxes after the installment agreement was reached with the IRS in late 2005.

On February 17, 2007, IRS officer Nick Tsirigotis visited HCI's office and informed plaintiff, Mr. Dickerson, and Ms. Robertson of HCI's failure to pay withholding taxes from the fourth quarter of 2005 through the fourth quarter of 2006.  Mr. Gann claims that this is the first time that he learned of HCI's continuing failure to remit payroll taxes.  *See* Pl.'s Ex. A at A8 (Gann Decl.).  Mr. Tsirigotis interviewed Mr. Gann and recorded the results in a IRS Form 4180, Report of Interview. Def.'s Ex. 22 (Form 4180, Report of Interview of Scott Gann).  Mr. Gann signed the report but noted that he would "comment later" on the last page in the "Additional Comments" section.  *Id.* at A75.  Mr. Gann recalled that he was told by Mr. Tsirigotis that he would be able to amend his answers later.  Pl.'s Ex. A at A9.  That never happened.

In that report, Mr. Gann is listed as "Investor/Board Member" of HCI. Def.'s Ex. 22 at A71.  A checklist of questions regarding functions and duties performed for HCI reflects a "yes" answer for whether Mr. Gann performed the following:

> a. Determine financial policy for the business?
> b. Direct or authorize payments of bills?
> c. Open or close bank accounts for the business?
> d. Guarantee or co-sign loans?
> e. Sign or counter-sign checks?
> f. Authorize or sign payroll checks?
> g. Authorize or make Federal Tax Deposits?
> h. Prepare, review, sign, transmit payroll tax returns?

*Id.* at A73.   The period of time for each of those actions listed was from February 2005 to "current."   *Id.*   Listed for each question under "who else performed this duty" was "Mimbi [Robertson]."   *Id.*   A question regarding payment of other obligations during the period when delinquent taxes were owed reflects that all other bills were paid and that "Both Ms. [Robertson] and Mr. Gann discussed the bills and which would be paid."   *Id.* at A74.   Plaintiff now disputes much of the information recorded in the Form 4180 as inaccurate as a result of a rushed interview and not having been afforded an opportunity to review the document after the fact.

Mr. Tsirigotis remained in regular contact with Mr. Dickerson and plaintiff from February 2007 through September 2007.   During that period, plaintiff pursued selling the company to a third party.   The IRS agreed to postpone filing a lien in the hopes that the sale of HCI would generate enough money to cover HCI's back taxes.   *See* Pl.'s Ex. A at A9-10.   HCI was allowed to continue operating.   Mr. Dickerson stated in his declaration that HCI was specifically allowed to meet its other financial obligations in order to keep HCI afloat while a sale was pursued.   Pl.'s Ex. B at A16-17.   Another reason not to place a tax lien on HCI was that HCI had a factoring agreement with another company, Textron Financial, pursuant to which Textron provided cash flow to HCI to meet daily operating expenses in exchange for an interest in HCI's accounts receivable.   *See* Def.'s Ex. 49 at A506-508 (Dickerson Dep.).   A tax lien would have put an immediate end to the factoring agreement.   *Id.* at A506.

HCI informed the IRS that a potential sale of HCI fell through in September 2007.   The IRS promptly placed a tax lien on all of HCI's assets.   Textron quickly terminated its factoring agreement, and, unable to fund payroll, HCI ceased operations on September 17, 2007.

## DISCUSSION

Section 6672 of the Internal Revenue Code imposes personal liability on individuals who are "required to collect, truthfully account for, and pay over any tax" and who "willfully fail[] to collect such tax, or truthfully account for and pay over such tax."   26 U.S.C. § 6672 (2012).   Under the statute then, the penalized individual must have been a (1) "responsible person," or someone responsible for having collected and paid the tax in the first place, and (2) must have willfully failed to collect and pay that tax.   *Godfrey v. United States*, 748 F.2d 1568, 1574 (Fed. Cir. 1984).   IRC section 6671 defines a "person" as used in 6672 as "an officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or

member is under a duty to perform the act in respect of which the violation occurs." 26 U.S.C. § 6671(b).  There can be more than one responsible person in a business.

Whether an individual is a "responsible person" within the meaning of section 6672 is necessarily a factual question to be determined in the totality of the circumstances; no single factor is determinative.  *See United States v. Rem*, 38 F.3d 634, 642 (2d Cir. 1994).  "It is a test of substance and not form." *Godfrey*, 748 F.2d at 1576.  The crucial inquiry is whether the individual has the "power to compel or prohibit the allocation of corporate funds." *Id.*  The Federal Circuit's seminal opinion on section 6672 liability, *Godfrey v. United States*, summarized its predecessor court's history regarding "responsible person" liability under section 6672 as follows: "[W]here a person has authority to sign the checks of the corporation, or to prevent their issuance by denying a necessary signature, or where that person controls the disbursement of the payroll, or controls the voting stock of the corporation, he will generally be held 'responsible." *Id.* (internal citations omitted).  In *Godfrey*, the court held that the trial court had erred in finding Mr. Godfrey a responsible person based solely on his involvement with the company and the facts that he was the chairman of the board and had knowledge of the tax delinquency. *Id.* Missing was the critical fact that Mr. Godfrey had actual control over the finances rather than mere involvement in operations. *Id.*

The separate requirement that a responsible individual also have acted willfully in failing to withhold and/or remit the tax also presents a fact-intensive inquiry, calling for "proof of a voluntary, intentional, and conscious decision not to collect and remit taxes thought to be owing." *Id.* at 1577.  This does not, however, require a showing of specific intent to defraud or otherwise of an evil motive. *Id.*  The Second Circuit summed up the willfulness prong by  stating that the person must have known "of the company's obligation to pay withholding taxes" and known "that the company funds were being used for other purposes instead." *Rem*, 38 F.3d at 643.  The Federal Circuit in *Godfrey* also stated that the willfulness prong, though not satisfied by mere negligence, could be met by a showing of "reckless disregard of an 'obvious and known risk' that taxes might not be remitted." *Godfrey*, 748 F.3d at 1577 (quoting *Feist v. United States*, 607 F.2d. 954, 961 (Ct. Cl. 1979)).

Defendant has moved for summary judgment on these two questions.  In order to grant the motion, we must be satisfied that there is no material dispute that Mr. Gann was a responsible person under section 6672 and that he willfully failed to remit withholding taxes to the IRS for the quarters in

question.  *See generally Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986).  A factual dispute is only material if it "might affect the outcome of the suit under the governing law."  *Id.* at 248.  Thus there will generally only be a genuine issue that would prevent summary judgment when the evidence presented requires the court to weigh it and find that one side's evidence is more credible than the other.  *See id.* at 251-52.  When the court need not decide whose evidence is better or more credible, because the evidence is undisputed, the court may enter judgment as a matter of law for the moving party.

I.  Mr. Gann Was A Responsible Person

Defendant argues that Mr. Gann was a responsible person by virtue of his having been HCI's initial investor and ongoing funding source, sole director of HCI, majority shareholder of both HCI and its holding company, chairman of the board of its holding company, signatory on all of its bank accounts, and by virtue of having signed 2500 checks on behalf of HCI, personally guaranteed HCI's debt, and having been a principal creditor of HCI. Defendant argues that plaintiff was responsible for making all major financial decisions and was consulted on which bills were to be paid and when to pay them.  It is thus uncontroverted, in defendant's view, that Mr. Gann had both a reason and the authority to direct that HCI pay its withholding taxes.

Plaintiff answers that Mr. Gann cannot be held to be a responsible person on this record because the government's evidence is unreliable and crucial facts are disputed. Plaintiff's chief argument regards Ms. Robertson's dueling statements regarding her level of control over HCI's operations as CEO.  As noted previously, she signed an affidavit in 2008 in which she swore that she was responsible for HCI's daily operations, including its finances and decisions as to which bills were to be paid.  In 2014 she disclaimed those statements as having been made under duress.  That 2014 declaration is suspect, according to plaintiff, because she harbored personal animus against Mr. Gann after he fired her in 2010.[5]

---

[5] Ms. Robertson continued to work for Mr. Gann after HCI was closed until some point in 2010 when she was fired for allegedly making unauthorized charges on a credit card belonging to Mr. Gann.  *See* Pl.'s Ex. A at A11-13. Plaintiff also contends that she never requested that her 2008 affidavit be returned to her as alleged in her 2014 declaration.

Plaintiff also disputes the deposition testimony of Bill Huff, the independent auditor, arguing that it was contradicted by Mr. Dickerson's testimony and is likely inadmissable due to lack of foundation and a possible hearsay objection. Plaintiff argues that Mr. Huff's role was limited to reviewing HCI's financial records and SEC filings, which means that he would have had limited interaction with Mr. Gann and limited observation of the daily operation of HCI. Mr. Huff's testimony is therefore an insufficient basis to establish plaintiff's personal responsibility for failure to remit the withheld tax payments, according to plaintiff. Plaintiff argues instead that the evidence shows that his actions were consistent with those of a director of a corporation and investor in it, not the president or CEO of one.

Plaintiff also challenges the contents of the IRS Form 4180 record of his interview with Mr. Tsirigotis. Plaintiff points to his deposition in which he disputed many of the yes/no answers as incorrect. *See* Pl.'s Ex. I at A100-121 (Pl.'s Excerpts from Gann Dep.). He likened the interview and report to a multiple choice test in which Mr. Tsirigotis had "missed all the questions." *Id.* at A121. Plaintiff also admits that neither he nor Mr. Tsirigotis provided comments or otherwise corrected the record of the interview afterwards. He contends, however, that the failure to pursue that avenue was because he was pursuing the IRS-approved sale of HCI, which, according to plaintiff, made the form irrelevant at the time.

Although much of the evidence relied on by the government is disputed by contrary testimony presented by plaintiff, there are several important and highly relevant uncontroverted facts. First, plaintiff was the majority shareholder and the sole director of HCI. He also controlled the voting stock of HCI's parent companies after HCI was reverse merged into Tabatha IV, Inc. and then Humanity Capital Holding Company. Mr. Gann owned 89 percent of the holding company's stock. *See* Def.'s Ex. 38 at A198-99 (Tabatha IV SEC Form 8-K). He was also elevated to Chairman of the Board of the holding company. Def.'s Ex. 30 (resolution changing the name and electing Scott Gann as chairman). Second, plaintiff had authority to sign checks and obligate HCI to pay funds. For several early accounts at Sovereign Bank, he was the only authorized signer. Third, Mr. Gann signed over 2500 checks on behalf of HCI, paying all manner of HCI obligations from payrolls to consultant fees. Fourth, plaintiff signed on behalf of HCI for loans, leases, commercial guarantees, and other agreements. He obligated both himself and HCI on behalf of HCI.

Mr. Gann testified that, although he was not allowed to be an executive

12

at HCI because of his job at an investment firm, given the amount of money
he had invested in the company, he wanted to be a board member and "to
watch what was going on" in order to know whether to cut his losses. Def.'s
Ex. 46 at A334. This oversight was more than passive. From HCI's inception,
plaintiff had control over large outlays of funds, owing to the fact that he was
the only investor in HCI and most often its lender of first and last resort. Ms.
Robertson had to get Mr. Gann's agreement on the office space to be leased
because she wanted to spend more than he thought appropriate. *See id.* at
A336-37. Mr. Gann personally executed that commercial lease. Def.'s Ex. 29
at A.157, A160. Mr. Gann leased the initial fleet of vans for HCI's operations.
Def.'s Ex. 46 at A409. Mr. Gann also acted as a personal guarantor for at least
one loan that HCI took out from Sovereign Bank. *Id.* at A375. Mr. Gann
further signed a corporate resolution to borrow in connection with that loan.
Def.'s Ex. 28 at A140-41.

Plaintiff also had the power to demand quick repayment on a loan that
he personally made to HCI in 2007. He testified that he agreed to lend the
money only on the express agreement that it be repaid within 24-48 hours, and
it was so repaid, at least partially.[6] Def.'s Ex. 46 at A357; Pl.'s Ex. A at A4;
Def.'s Ex. 25 (copy of the check from HCI to Scott Gann).

Mr. Gann was also consulted regarding the IRS notice of delinquency
in 2005. Ms. Robertson brought the notice directly to him at his office at the
investment firm. Def.'s Ex. 46 at A344. He spoke with her and Mr. Dickerson
regarding the liability and sought to have it resolved as quickly as possible.
"We got on the phone [with the IRS] immediately." *Id.* After Mr. Dickerson
negotiated an installment agreement with the IRS to resolve the back taxes,
Mr. Gann recalls having personally signed at least one check to the IRS for the
delinquent taxes, s*ee* Pl.'s Ex. A at A6, and plaintiff presented copies of three
checks to the IRS signed by Mr. Gann, *see* Pl.'s Exs. D-F.

In sum, Mr. Gann had the authority to sign checks and meet the
obligations of HCI. He also had the authority to obligate HCI and signed
documents to effectuate a loan to HCI from Sovereign bank. He, or his wife

---

[6] At his deposition, plaintiff testified that the $13,000 was a repayment of a
very short term bridge loan. Later, in his 2014 declaration appended to his
opposition to the motion for summary judgment, Mr. Gann stated that he was
repaid $13,000 of a total $20,000 that was owed him. *Compare* Def.'s Ex. 46
at A357 *with* Pl.'s Ex. A at A4.

for a short time, controlled the voting stock of HCI and its holding company. He was the sole director of HCI and the Chairman of the Board of its holding company. Mr. Gann had the "power to compel or prohibit the allocation of corporate funds" as stated in *Godfrey*. 748 F.2d at 1576. The undisputed facts here meet virtually every one of the set of circumstances listed by the Federal Circuit in *Godfrey* as exemplary to establish responsibility under the statute. *See id.* (listing cases from the former United States Claims Court in which liability as a responsible person was found).

It does not matter that Ms. Robertson may have had control over the daily operations of HCI. Section 6672 asks only whether the individual in question, here Mr. Gann, could and should have prevented the failure to pay. "The section is generally understood to encompass all those officers who are so connected with a corporation as to have the responsibility and authority to avoid the default which constitutes a violation of the particular Internal Revenue Code section." *White v. United States*, 372 F.2d 513, 516 (Ct. Cl. 1967). That is, the statute is concerned with who had the ultimate authority or final word over what bills should be paid and when. *Id.*; *Godfrey*, 748 F.2d at 1575. Although it may be that Mr. Gann in large delegated that authority to Ms. Robertson for the day-to-day operations, there is no question that the final control over the purse strings of HCI rested in plaintiff's hands, even if he did not exercise it consistently. Plaintiff was a "responsible person" under IRC § 6672 and can be held liable for HCI's failure to pay over employee withholding.

II. Whether Mr. Gann Willfully Failed To Remit Withheld Taxes Is In Dispute

The inquiry does not end there, however. Mr. Gann must also have willfully chosen not to pay the taxes or recklessly neglected the risk that they might not be paid. The government argues that the evidence presented establishes that plaintiff willfully failed to pay the employment taxes from November 2005 forward. It is enough, according to defendant, that plaintiff knew of the taxes owed and chose to authorize and approve payments to creditors other than the United States, including one payment to himself in 2007. Defendant points to several payroll checks signed by Mr. Gann in May 2005 and January 2007 and a check to a consulting firm in April 2006. Defendant compares the total inflows and outflows of funds through HCI during the period of delinquency and notes that enough money came in to pay the IRS. That HCI paid other creditors other than the IRS is evidence that Mr. Gann, as the one in ultimate control of the finances, willfully chose not to pay the owed taxes.

Defendant also argues that Mr. Gann's actions amounted to a reckless disregard of an obvious and known risk that the funds might not be paid to the IRS when, after knowing of the problem in November 2005, he failed to take reasonable steps to insure that it did not happen again.  If Mr. Gann was in fact ignorant of HCI's delinquency going forward from November 2005, it reflected reckless disregard.

Plaintiff responds first that, as a general matter, the willfulness prong is particularly unamenable to resolution by motion for summary judgment. Plaintiff argues that the government has not provided any specific evidence that Mr. Gann knew of HCI's failure to pay prior to notice in November 2005 nor afterwards until the IRS visit in 2007.  No actual knowledge means no intentional decision not to pay and no reason to have inquired, according to plaintiff.  Plaintiff next points the court to his prompt action in response to the notice of delinquency in November 2005.  This is evidence, plaintiff suggests, that he  intended to pay any taxes in arrears and wanted HCI to pay over all payroll taxes going forward.

Plaintiff also disputes the suggestion that he recklessly disregarded the possibility that the withholding might not be remitted to the IRS from late 2005 forward.  Plaintiff argues that the government has misread the law and that such a holding would be grossly improper on the record as presented for summary judgment, especially in light of the evidence of Mr. Gann's prompt action to resolve the 2005 liability.  Plaintiff further argues that Ms. Robertson withheld crucial information from him, which prevented him from ascertaining that the company was not paying its payroll taxes after 2005.  He did inquire and was lied to, according to plaintiff, which means that he could not have acted with a reckless disregard.

We agree with plaintiff that there are material facts in dispute with regard to whether and when plaintiff knew of the continuing failure of HCI to pay over its withheld employee taxes.  Plaintiff testified that he inquired regarding the taxes, albeit infrequently, after November 2005 and was lead to believe that they were current.  He also stated that he reviewed the holding company's SEC forms in 2006, which did not indicate any new IRS liabilities. Mr. Dickerson's and Mr. Gann's testimony is in agreement that the normal practice was for the bookkeepers in the accounting department, under Ms. Robertson's supervision, to pay the quarterly taxes due.

Mr. Gann may have signed several checks to the IRS for the taxes in arrears for 2005, but that does not establish his knowledge of the problem

going forward.  Nor is it sufficient, as defendant posits, that Mr. Gann signed checks to creditors other than the IRS after November 2005.  If Mr. Gann was not normally in charge of making the tax payments, if had reason to believe that payments were being made or was misled to believe so, and if he did not have actual knowledge of the failure to pay, we cannot say that he willfully failed to pay.  Whether he was wantonly negligent of the risk of nonpayment can only be determined after hearing all of the evidence and weighing it appropriately.  All of those questions remain open for resolution at trial.

CONCLUSION

Because Mr. Gann had ultimate control over the finances of HCI as its controlling shareholder, funder, only corporate director, and personal guarantor, he was a responsible person under 26 U.S.C. § 6672 and can be held personally liable for HCI's unpaid taxes.  Summary judgment is therefore granted for defendant on the question of the responsibility of Mr. Gann. Summary judgment is denied as to the question of Mr. Gann's willful failure to pay.  There remain material questions of fact as to what Mr. Gann knew and when he knew it.  Accordingly, defendant's motion for summary judgment is granted in part and denied in part.  The parties are directed to confer and file a joint status report proposing a pretrial schedule on or before June 22, 2015.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Judge