# In the United States Court of Federal Claims

No. 10-359T
(Filed: September 16, 2016)

* * * * * * * * * * * * * * * * * *

SCOTT B. GANN,

               *Plaintiff*,

v.

THE UNITED STATES,

               *Defendant.*

* * * * * * * * * * * * * * * * * * *

| |
|---|
| Employee withholding; Trust fund taxes; 26 U.S.C. § 6672; Failure to pay over; Willfulness; Reckless disregard of an obvious and known risk of nonpayment. |

*Kerry L. Pedigo*, Dallas, TX, for plaintiff.

*Jason Bergmann*, Tax Division, United States Department of Justice, Washington, DC, with whom were *Caroline D. Ciraolo*, Acting Assistant Attorney General, *David I. Pincus*, Chief, Court of Federal Claims Section, *G. Robson Stewart*, Assistant Chief, and *Jason S. Selmon*, Trial Attorney, for defendant.

## OPINION

BRUGGINK, Judge.

This is a tax refund suit challenging the imposition of a "trust fund tax penalty" on plaintiff for the failure to pay over employees' FICA taxes to the government. We have previously held that plaintiff was a responsible party. Trial on remaining issues was held in Dallas, Texas from December 8 to December 11, 2015. The matter is fully briefed. Post-trial argument was conducted on June 7, 2016. As more fully explained below, because plaintiff was grossly negligent in disregarding an obvious and known risk of failure to pay over the withheld funds, the penalty was proper as to the fourth quarter of 2005 and forward.

<u>BACKGROUND</u>

I.  Legal Background And Procedural History

The Internal Revenue Code ("IRC") requires employers to withhold income and social security taxes from employee wages and to submit them to the Internal Revenue Service ("IRS") on behalf of those employees. *See* 26 U.S.C. §§ 3102(a), 3402(a) (2012). The law imposes on employers the duty to collect and hold these funds in trust. *See* 26 U.S.C. § 7501 ("the amount of tax collected or withheld shall be held to be a special fund in trust for the United States"). Thus the "trust fund tax" nomenclature. Even if an employer fails to remit the withheld monies to the IRS, the employee is nevertheless credited with having paid the taxes. *See Slodov v. United States*, 436 U.S. 238, 243 (1978). The employer remains liable, however. Section 6672 of the IRC provides an additional protection for the government–personal liability on the part of those responsible for failing to remit the withheld funds to the government. 26 U.S.C. § 6672. "Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such a tax . . . and pay over such tax . . . shall . . . be liable to a penalty equal to the total amount of the tax evaded." *Id.* This is known as a "trust fund recovery penalty."

The IRS levied the trust fund recovery penalty on plaintiff, Scott Gann, for failing to pay over the trust fund taxes withheld from employees of Humanity Capital, Inc. ("HCI") for the tax quarters that ended on June 30, 2005, through September 30, 2007. The total amount assessed against plaintiff was $699,690.33, plus statutory interest. JXs 1-10 (IRS Form 4340s reflecting trust fund penalties assessed against plaintiff).[1]

Mr. Gann made a partial payment of $467.00 for the first quarter of 2007, and, on February 9, 2010, filed a claim for refund of that amount and sought abatement of the remaining penalty assessed against him. That request was subsequently denied. Plaintiff filed suit for the same relief in this court on July 10, 2010. Defendant has counterclaimed for an amount equal to the balance of the assessed penalty plus accrued statutory interest.

---

[1] "JX" refers to a joint exhibit. "PX" refers to a plaintiff's exhibit, and "DX" refers to a defendant's exhibit.

In order to collect such a penalty, the penalized individual must have been (1) responsible for having collected and paid the tax, and (2) must have willfully failed to collect and pay it over to the IRS. *Godfrey v. United States*, 748 F.2d 1568, 1574 (Fed. Cir. 1984). IRC section 6671 defines a responsible person as referred to in 6672 as "an officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or member is under a duty to perform the act in respect of which the violation occurs." 26 U.S.C. § 6671(b). There can be more than one responsible person in a corporation or other business entity.

After discovery, defendant moved for entry of summary judgment, arguing that plaintiff was both responsible for collecting and paying the tax and willful in not doing so. On May 28, 2015, we granted that motion in part and denied it in part, holding that Mr. Gann met the test for responsibility but that there were material facts in dispute as to his willfulness. *Gann v. United States*, 121 Fed. Cl. 482 (2015). We thus set the matter for trial.

## II. General Background

Scott Gann has been employed in the financial sector since 1992, initially on Wall Street and eventually in Dallas and then Houston, Texas. During the time period relevant here (2005-2007), he was employed by an investment banking firm in Houston as a managing director.

During the summer of 2004, Mr. Gann played in a charity golf event at which he was paired with a long-time, but then-currently unemployed, veteran of the temporary staffing business, Andy Wimpee. Mr. Wimpee persuaded Mr. Gann that a "smart investment banker with a little bit of capital behind him could make a fortune" in the staffing business by buying up competitors and then packaging the conglomerate as a publically traded entity. Tr. 251 (Gann). Plaintiff was excited by the idea and pursued it. Mr. Wimpee introduced Mr. Gann to Charlie Dickerson, a certified public accountant ("CPA") and another veteran of the temporary staffing industry. Mr. Gann also had a preexisting relationship with Mimbi Robertson who had over 10 years of very successful experience with sales in the temporary staffing industry.[2]

---

[2] Ms. Robertson, as she was known at the time, has since remarried and is now named Mimbi Beck. We refer to her as she was known at the time of the
(continued...)

Mr. Gann brought these people together and proposed that Mr. Wimpee run the new enterprise as Chief Executive Officer ("CEO"), Mr. Dickerson would serve as Chief Financial Officer ("CFO") and finder of acquisition targets, and Ms. Robertson would run sales–because she already had a multi-million dollar book of business with another company, all or most of which Mr. Gann and the others viewed as poachable. Ultimately, Mr. Wimpee was not retained as CEO and Ms. Robertson was designated in his place. The when and why of that promotion are in dispute and will be discussed further below.

Mr. Gann funded the start up of Humanity Capital Incorporated ("HCI"), a temporary staffing company in Dallas, Texas. HCI was formally incorporated on February 7, 2005. JX 53 (Articles of Incorporation). Mr. Gann was listed as its only director at founding. *Id.* at 4. In furtherance of his goal of taking this new company public, Mr. Gann sought to purchase a company already listed and traded publically in order to combine the two entities and thus making it more attractive to investors on. He was successful in that search, and, in May 2005, HCI became a wholly-owned subsidiary of Tabatha IV, Inc., a public company.[3] As a part of that reorganization, Mr. Gann was issued all of the company's common stock. On January 6, 2006, Tabatha IV was renamed Human Capital Holding Corporation ("HCHC"). Mr. Gann was elected Chairman of the Board, on which Mr. Dickerson and Ms. Robertson also served. *See* JX 68 (January 6, 2006 Action by Unanimous Written Consent in Lieu of a Meeting of the board of HCHC). We will refer to all of these entities collectively as "HCI" unless otherwise indicated.

Owing largely to Ms. Robertson's contacts, HCI quickly acquired clients and expanded rapidly. HCI employed approximately nine permanent office staff and, at its peak, approximately 400 temporary employees who were

---

[2](...continued)
events at issue.

[3] Mr. Gann bought the then-dormant company, Tabatha IV, which, although it had no business operations or liabilities, was listed with the Securities and Exchange Commission ("SEC"). Being listed with the SEC, it was therefore publically tradeable. The two were then "reversed merged," meaning that Tabatha IV acquired HCI. Mr. Gann explained that this is known as a reverse merger because the non-operating entity, Tabatha, was acquiring the operating one, HCI, or, as he put, the "shrimp that's swallowing the whale." Tr. 267.

contracted out to other companies, primarily in light industry.  HCI was never profitable, however.  A consolidated balance sheet for the period beginning February 2005 and ending March 31, 2006, shows significant net losses as early as June 30, 2005.[4]  *See* JX 49.  The company was dependent upon a series of cash infusions from Mr. Gann, which eventually totaled approximately $700,000.  Those loans were not repaid, with the exception of one $13,000 bridge loan that was repaid within two days in August 2007.

III. The Tax Problem

From the start, HCI did not remit to the IRS all of the payroll taxes that it withheld from its temporary employees' paychecks.  Quarterly tax returns for the second and third quarters of 2005 show payroll taxes owed in the amounts of $27,466.88 and $32,6999.44 respectively.  JX 22; JX 23.  It is not clear how or why these monies were not paid over to the IRS, other than that HCI was never profitable.[5]  Mr. Gann testified that he first became aware of these deficiencies in November 2005 when Ms. Robertson came to his office and showed him a notice of deficiency from the IRS.  Mr. Gann contacted the IRS soon thereafter to discuss the liability.  Mr. Dickerson testified that he was also involved in that effort.

The result of these efforts in late 2005 was an agreement with the IRS under the terms of which HCI would make installment payments to catch up on its back taxes.[6]  Mr. Dickerson and Mr. Gann testified that, after the installment agreement, they believed HCI was keeping current on its ongoing payroll taxes.  In fact, however, HCI never consistently paid all of the withheld amounts to the government.  Some months it succeeded or came close, but in no quarter did it fully meet its trust fund tax obligations.  The situation came to a head in February 2007 when an IRS Revenue Officer, Nick Tsirigotis,

---

[4] The loss was $98,911 for the second quarter of 2005. The balance sheet also showed a net loss of $22,876 for the previous quarter, the first in which HCI operated.

[5] Mr. Gann and Mr. Dickerson believed that money would be shortly available from outside investors, and Mr. Gann, on multiple occasions, met the immediate solvency concerns of the company.

[6] Neither party was able to produce the installment agreement during discovery.

visited HCI unannounced and informed plaintiff that HCI had not kept current on its payroll taxes and that the IRS intended to file a tax lien against the business.

Mr. Tsirigotis visited HCI's office on February 14, 2007, and informed plaintiff, Mr. Dickerson, and Ms. Robertson of HCI's failure to pay withholding taxes from the fourth quarter of 2005 through the fourth quarter of 2006. Shortly thereafter, Mr. Tsirigotis returned and conducted an interview of Mr. Gann on February 22, 2007, the results of which were recorded by Mr. Tsirigotis in an IRS Form 4180 Report of Interview.  DX 2 (Form 4180 Report of Interview). Mr. Gann signed the report but noted on the last page in the "Additional Comments" section that he would "comment later." *Id.* at 257.[7] Mr. Gann testified that he was promised by Mr. Tsirigotis that he would be able to edit and amend his answers later. Whether or not that promise was made, it is not disputed that Mr. Gann never amended his answers.

In that report, Mr. Gann is listed as "Investor/Board Member" of HCI. The report reflects a checklist of questions asked of Mr. Gann regarding his functions and duties performed for HCI. The following reflect a "yes" answer by Mr. Gann:

> a. Determine financial policy for the business?
> b. Direct or authorize payments of bills?
> c. Open or close bank accounts for the business?
> d. Guarantee or co-sign loans?
> e. Sign or counter-sign checks?
> f. Authorize or sign payroll checks?
> g. Authorize or make Federal Tax Deposits?
> h. Prepare, review, sign, transmit payroll tax returns?

*Id.* at 255. The period of time for each of those actions listed was from February 2005 to "current." *Id.* Also listed for each of those questions, under "who else performed this duty," he wrote, "Mimbi [Robertson]." *Id.* A question regarding payment of other obligations during the delinquent period reflects that all other bills were paid and that "[b]oth Ms. [Robertson] and Mr.

---

[7] Our citation to specific pages in exhibits is to the bates page number added during discovery, when available. If not available, the cite is to the document's own internal pagination.

Gann discussed the bills and which would be paid." *Id.* at 256.  At trial, plaintiff disputed most of this information as inaccurate or misleading and reflective of an assumed opportunity to amend his answers later.

Mr. Tsirigotis remained in regular contact with plaintiff, Mr. Dickerson, and Ms. Robertson from February 2007 through September 2007.  During that period, plaintiff continued to pursue taking HCI public as a way to raise significant capital.  When it became apparent that an IPO was not likely in the short term, Mr. Gann and Mr. Dickerson attempted the sale of HCI to a third party.  At plaintiff's request and on Mr. Tsirigotis' recommendation, the IRS agreed initially to postpone filing a tax lien in the hopes that the sale of HCI would generate enough money to cover the company's back taxes.  HCI continued operating normally.[8]

Facing a lack of concrete progress and plaintiff's continuing failure to keep current on its trust fund taxes, Mr. Tsirigotis filed a notice of tax lien on June 28, 2007, to preserve the IRS' rights.  The parties remained in contact, however, and Mr. Dickerson continued to represent that a sale of the company was likely.  As late as September 12, 2007, Mr. Tsirigotis believed that a sale of HCI was imminent.  In the face of an IRS lien on HCI's accounts receivable, however, HCI's payroll lender, Textron, terminated its factoring agreement.  HCI, then unable to fund payroll, ceased all operations on September 17, 2007.[9]  Mr. Tsirigotis visited HCI's offices one last time in November 2007 but found them empty and abandoned.

IV.  Trial Testimony

At trial, we heard testimony from five witnesses.  We briefly summarize their testimony and discuss it in more detail in connection with subsequent findings.

---

[8] Mr. Tsirigotis also recalled receiving a proposal on February 20, 2007, for HCI to pay its back taxes in installments over a 57-month period.  He testified that the IRS did not consider accepting that proposal because HCI was not keeping current on its payroll tax obligations.

[9] Pursuant to the factoring agreement, Textron loaned HCI funds to meet its regular payroll obligations in exchange for a percentage of accounts receivable.

A.  Scott Gann

Plaintiff testified regarding his educational and employment background and the circumstances that lead to his founding of HCI.  He was not particularly interested in being in the staffing business as a career change but instead hoped to be able to draw upon outside investors to fund the acquisition of HCI's competition to form a conglomerate worthy of being traded publicly  This, he believed, would lead to a payday in the tens of millions of dollars.  His background on Wall Street provided him with the contacts necessary to attract investors to the idea.

His employer at the time was unwilling, however, to let Mr. Gann serve as an officer in this new venture.  He thus set himself up as the Chairman of the Board of HCI and its publicly traded holding company.  He funded the seed capital of the company, the acquisition of the public shell, various cash infusions when there were shortfalls, and the fees associated with investment firms completing their due diligence investigations into the finances of HCI.  Mr. Gann expended nearly $700,000 by the time HCI folded.

Plaintiff testified that three hedge funds were interested in providing initial capital for HCI's acquisitions of other companies.  Mr. Gann selected one particular fund, Bridge Capital, and paid it $50,000 to cover its costs in investigating HCI's financial position.  Two individuals from the hedge fund visited HCI for a week, and then an auditor came back for an additional two weeks.

The other major subject of his testimony was Mr. Gann's interactions with the IRS in November 2005 and again in February through September 2007.  The import was twofold: as to the November 2005 episode, Mr. Gann testified that he moved swiftly to resolve the problem by agreeing to a payment plan and then making those payments as promised.  It was his recollection that the early 2005 shortfall was fully satisfied per the terms of that agreement.  He instructed staff to make those payments by physical check and to make copies for HCI's records.  He was also asked what his understanding was at the time for why the withheld amounts had not been remitted to the IRS.  He answered that Ms. Robertson had told him that it was the fault of a previous bookkeeper.  Thus he did not have a concern that taxes would not be paid in the future.

As to the second round of direct IRS involvement with HCI in 2007, Mr. Gann testified that he was once again completely surprised by the failure

to pay the trust fund taxes and was shocked at the total then owing to the IRS–$700,000, of which $350,000 were trust fund taxes.  It was also his testimony that Mr. Tsirigotis encouraged him and HCI to continue operating after the initial February 2007 meetings because it was in the government's best interest that HCI continue to operate and possibly go public or be sold in order to generate a larger sum of money from which the IRS might be paid.  To that end, Mr. Tsirigotis did not initially file a tax lien, remembered plaintiff.  Mr. Gann testified that he then sought tax and legal advice while directing Mr. Dickerson and Ms. Robertson to cooperate fully with the IRS investigation of HCI and keep Mr. Tsirigotis apprised of any developments.

Mr. Gann testified that he believed he had an understanding with Mr. Tsirigotis that the daily financial obligations of HCI could be satisfied during this period.  He believed that HCI was operating in a way that was consistent with Mr. Tsirigotis' instructions to keep the business open rather than to liquidate and attempt to pay back taxes.

## B.  Charlie Dickerson

Mr. Dickerson testified regarding his role at HCI as a consultant, quasi-CFO, and spearhead of Mr. Gann's plan to acquire its competitors.  He is a CPA and a long-veteran of the staffing industry and was quite familiar with the industry in the Dallas area.  Prior to his agreement with HCI, he worked at a firm called Snelling and Snelling, a large staffing company based in Dallas.  He testified that he was involved in Snelling and Snelling's successful acquisition of a number of smaller staffing companies, essentially brokering those deals.  After he left that company, he started his own consulting business to broker acquisitions in the staffing industry.

His testimony centered around his role at HCI, his efforts to find acquisition targets, various financial reports he generated, an outside audit of HCI, and the events leading up to the closure of HCI in September 2007.

His duties at HCI were twofold: to find companies to buy and to act as a sometimes-CFO.  The latter function included the set up of accounting systems and payroll at the inception of HCI and preparation of financial statements and similar documents when needed by outside concerns or when sought by Mr. Gann.  He testified that he met with Mr. Gann frequently to discuss both topics, but primarily to discuss possible acquisitions.  At least monthly they discussed the overall financial condition of HCI, however.  He

testified that he spent no time supervising the bookkeepers.

Mr. Dickerson did not recall ever specifically discussing tax liabilities and unpaid trust fund taxes with Mr. Gann. He also testified that he was unaware of HCI's tax problem and could not recall ever having reviewed HCI's quarterly tax returns. He admitted on cross-examination, however, that his handwriting appears on one return. *See* JX 22. He was listed on that return as a third party with whom the IRS could discuss the return. JX 22 at 251; Tr. 153. He stated that he was unaware of whether trust fund tax liabilities were paid at the time the returns were filed with the IRS.

Regarding his and HCI's interactions with the IRS in 2007, Dickerson confirmed that Mr. Tsirigotis believed it to be in the government's best interest for HCI to continue operating while a potential sale was negotiated. He did not recall discussing with the IRS or Mr. Gann the need for HCI to keep current with its payroll tax obligations. He confirmed that it was likely that, from the IRS' perspective, the company would keep current on its taxes while the IRS delayed filing a notice of lien.

C. William Huff

We also heard the testimony of William Huff, a CPA and shareholder of the accounting firm Farmer, Fuquay & Huff. Mr. Huff and his firm were retained by HCI to perform independent audits of HCI and its holding company for the fiscal years ended on June 30, 2005 and June 30, 2006. Mr. Huff testified that Mr. Dickerson was the point of contact at HCI for the audits. He did not speak directly with Ms. Robertson but assumed that his employees had. He knew that she was the CEO. The firm did not prepare any financial statements for HCI as part of its audit.

Mr. Huff confirmed that the financial statements and underlying documentation that Farmer, Fuquay & Huff reviewed showed unpaid payroll tax liabilities for the fiscal year ending on June 30, 2005. Payroll taxes would be the sort of potential liability that his firm would inquire about in any audit. Mr. Huff did not recall whether he spoke with Mr. Dickerson about that particular liability, but Mr. Dickerson provided him with all of the information that he needed from HCI. Mr. Huff testified that he "probably had a phone conversation" with Mr. Gann during his engagement with HCI to discuss "these payroll taxes" as a growing liability. Tr. 736.

Mr. Huff testified that his firm prepared an independent audit report for fiscal year 2005, which concluded with a "going concern paragraph." This meant that "there is doubt that within one year form the balance sheet or that report date, that there's significant concern that the company would still be a going concern." Tr. 700. He further explained that the audit report, including the going concern paragraph, was added to HCI's SEC Form 10-K.[10] Mr. Huff's firm did not prepare the 10-K but did review it for consistency with the information that it had audited. The financial statements appended to the 10-K were those audited by Farmer, Fuquay & Huff. Mr. Huff further explained that payroll tax liabilities appeared in those audited financial statements grouped under "accounts payable" but they were not separately called out as a tax liability.

Similarly, Mr. Huff and his firm also reviewed the holding company's quarterly SEC reports for consistency with the audit. Mr. Huff testified that he was not aware of any material misstatements in those reports. He also testified regarding various work papers that his firm produced during the audit and other documents reviewed during this process. The import of that testimony was the growing payroll tax liability shown on those documents over time.

As to the audit for the fiscal year ended on June 30, 2006, Mr. Huff recalled that it was not completed by his firm. He could not recall precisely why, other than a general recall that the client either stopped providing requested information or decided that it no longer required an audit. The last point in time that he recalled performing work on the 2006 audit was November 2006.

D.  Mimbi Robertson

Ms. Robertson took the court through her history at HCI, centering on her role at the company and her relationship with Mr. Gann. She testified that

---

[10] The Securities and Exchange Commission ("SEC") requires that publicly traded companies file a yearly comprehensive summary of their finances. This is the 10-K form. A quarterly version must also be filed with the SEC, which is known as the 10-Q form. A Form 8-K must be filed to notify shareholders of important changes or significant events affecting a company, such as a bankruptcy or change in CEO.

she met Mr. Gann in the 1990s, prior to HCI. He knew her history in the staffing industry, particularly her success as a saleswoman, which is why he approached her at the inception of HCI. Ms. Robertson testified she was originally tasked to be in sales, but her title was changed to CEO when it became apparent that Mr. Wimpee would not be joining HCI. She told the court, however, that her title was illusory and that it was Mr. Gann and Mr. Dickerson who ran HCI. Instead, her only role was to bring in new business, she testified.

She was asked about her responsibilities and activities for HCI during the set up period. She testified that she had none. When asked specifically about selecting the office space for HCI, however, she confirmed that Mr. Gann sought her input and that she went with him on site visits. She stated that he made the ultimate choice.

Regarding her relationship with Mr. Gann, it was her testimony that it quickly soured. She described a hostile environment in which she was unhappy at how she was treated and he was unhappy with HCI's lack of profit. Their relationship, however, endured past the dissolution of HCI in September 2007. She testified that she remained employed by Mr. Gann personally, assisting him with collecting debts owed to HCI and helping him with various projects, such as setting up an office at his new home in Florida. It was during this period of time, she told the court, that Mr. Gann forced her to sign a statement to the effect that she was the CEO and had fiscal responsibility for HCI. *See* JX 47 (2008 Affidavit of Mimbi Robertson). At trial she recanted the representations made in that affidavit and further testified that it was made under duress.

E. Nick Tsirigotis

IRS Revenue Officer, Nick Tsirigotis, was the final witness. He testified about his efforts to collect the payroll taxes owed by HCI, beginning in February 2007. He recalled stopping at HCI's offices at one point prior to the February 14 meeting and inquiring who he should speak to about tax issues. He was told that Mr. Gann was the man he needed to see. When he followed up with a phone call to Mr. Gann before visiting again, he described Mr. Gann as unsurprised and acknowledging that he had received notices regarding taxes.

He also testified in some detail regarding that first meeting at HCI with

Mr. Gann, Mr. Dickerson, and Ms. Robertson in which all three were involved and answered questions. He also described his interview with Mr. Gann, a record of which is preserved in the IRS Form 4180.[11] He stated that he told Mr. Gann that he could provide further comment later, but Mr. Gann never asked him about it again.

He confirmed Mr. Gann's and Mr. Dickerson's testimony that he recommended to his manager that an IRS lien not be immediately perfected in order to give Gann and Dickerson time to sell HCI, thereby hopefully raising more money to pay the tax debt. He denied, however, the notion that he ever implicitly or affirmatively counseled HCI not to keep current on its payroll taxes going forward.

DISCUSSION

Willfulness under the statute is "a deliberate choice voluntarily, consciously, and intentionally made to pay other creditors instead of paying the Government." *Godfrey*, 748 F.2d at 1577. The Second Circuit summed up the willfulness test by stating that the person must have known "of the company's obligation to pay withholding taxes" and known "that the company funds were being used for other purposes instead." *United States v. Rem*, 38 F.3d 634, 643 (2nd Cir. 1994). In the context of an unpaid prior-incurred liability for trust fund taxes, this court has written that "a responsible person . . . who becomes aware that taxes went unpaid in past quarters . . . is under a duty to use all unencumbered funds available to the corporation to pay those back taxes," *Brinskele v. United States*, 88 Fed. Cl. 334, 348 (2009). Failure to do so is willful. *Id.* The willfulness requirement, though not satisfied by mere negligence, can be met with a showing of "reckless disregard of an 'obvious and known risk' that taxes might not be remitted." *Godfrey*, 748 F.2d at 1577 (quoting *Feist v. United States*, 607 F.2d. 954, 961 (Ct. Cl. 1979)).

The burden is on plaintiff to show that he neither 1) made a deliberate choice to pay other of HCI's obligations instead of the owed taxes, nor 2) became aware of unpaid back taxes and then failed to use all available unencumbered funds to pay them, nor 3) recklessly disregarded an obvious and

---

[11] He was very knowledgeable about IRS procedure and was careful to explain how and when he had authority to take actions and when his superiors' approval was required.

known risk of non-payment. *Brinskele*, 88 Fed. Cl. at 339 (citing *Stuart v. United States*, 337 F.3d 31, 36 (1st Cir. 2003)). This is because IRS tax assessments, including trust fund tax penalties, are presumed to be correct. *Id.* (citing *Ferguson v. United States*, 484 F.3d 1068, 1077 (8th Cir. 2007)). It is also the taxpayer's burden to prove that the amount of the assessment is erroneous. *Id.*

I.  Disputed Evidence And Factual Findings

At trial, the parties presented the court with very different pictures of the management of HCI. We were reminded of the adage that success has many fathers; failure, none. Mr. Gann suggested that Ms. Robertson ran the day-to-day operations, including paying bills and overseeing the back office accounting staff. He portrayed himself as a virtual absentee chairman of the board of the holding company, occasionally inquiring as to the financial state of the company, providing advice and counsel when sought, and pumping in cash infusions whenever HCI ran a shortfall. He viewed HCI as a successful start up attractive opportunity for outside investors. He thus had no reason to make an inquiry into the particulars of HCI's liabilities other than when approached for specific sums to meet specific obligations. In this scenario, he was unaware of HCI's failure to pay the trust fund taxes between the time that he entered the installment agreement at the end of 2005 and when the revenue agent informed him of the continuing failure in February 2007.

Defendant paints a contrasting portrait in which Ms. Robertson was nothing more than a saleswoman with an inflated title. According to the government, she had no control over the finances of HCI, limited knowledge of the tax problem, no oversight over bookkeeping staff, and no real management role other than regular meetings with Mr. Gann, at which he berated her for the company's poor performance and badgered her to sell more contracts. Defendant relies heavily on Ms. Robertson's testimony that she only paid bills at Mr. Gann's direction and had no independent oversight over any employee or obligation of the company.

Although neither party presented the court with a reason for HCI's repeated failure to pay over withheld sums to the IRS, we are persuaded that responsibility lies ultimately with Mr. Gann. Given the circumstances of this case, even if he was unaware of particular sums owed for particular quarters, he was reckless not to have inquired and prevented the problem. Trying to isolate which elements of the testimony of Mr. Gann, Mr. Dickerson, and Ms.

Robertson can be taken at face value is a challenge, but we have the testimony of Mr. Tsirigotis to assist along with the documentary record.

A.  Mr. Gann Was Regularly Involved in the Operation of HCI

Plaintiff testified at trial that, although he was regularly on location at HCI's office in Dallas, he was not overseeing operations.  Meetings with Ms. Robertson or Mr. Dickerson were not supervisory other than in a very general sense or they primarily concerned Mr. Gann's plan to buy up the competition, avers plaintiff.  Thus, according to plaintiff, he did not know of the failure to pay over the withheld taxes until Ms. Robertson alerted him in November 2005 and then not again until Mr. Tsirigotis visited HCI's offices in February 2007.  We find none of this credible.

Ms. Robertson stated that Mr. Gann and Mr. Dickerson made all of the financial decisions and that Mr. Gann told her what bills to pay.  In fact, when there was a shortfall, Mr. Gann brought that to her attention, not the other way around.  Tr. 619-20.  He reminded her every day that it was his company and his money.  Tr. Tr. 621.  Ms. Robertson painted a picture of a strained relationship between herself and Mr. Gann, one in which she was not trusted to make financial decisions or oversee other personnel.  Thus, she testified that she had no authority to pay the taxes even if she wanted to.

We credit neither individual's story as wholly truthful, but we are certain that both Mr. Gann and Ms. Robertson were involved in the regular, daily operations of HCI in a supervisory fashion.  We find the following facts.

1.  Office Presence

It is undisputed that Mr. Gann had an office in the same building as HCI and that it was paid for by HCI.  He explained at trial that he had the necessary equipment on site to conduct his investment and banking work in that office in order to suggest that his frequent presence was not entirely related to HCI's business, but there is no question that he was frequently present.[12]  Mr. Gann testified that he was on location around "a hundred times during the year."  Tr. 427.  Mr. Dickerson testified that Gann was at HCI "most of the time," although not necessarily overseeing HCI's operations the

_____

[12] He also stated that his trading job came first in priority.

entire time.  Tr. 76-77.  In short, Mr. Gann was in his office at HCI frequently and regularly.

### 2.  Regular Meetings with Dickerson and Robertson

Mr. Dickerson was responsible for setting up the "back office operations" of HCI according to the consulting agreement that he had with HCI.[13]  *See* JX 54 at 1.  This included responsibility for setting up HCI's accounting/bookkeeping department, one function of which was tax compliance.  *See* Tr. 414-15 (Gann).   Dickerson testified that he, Mr. Gann, and Ms. Robertson would take a look at the short term finances of HCI "at least weekly when the payroll and the billing was processed" and then, "at least monthly," they would look at the broader financial picture.  Tr. 77.  Mr. Gann added during his testimony that Mr. Dickerson communicated with him frequently on "a lot of matters."  Tr. 418-19.  They both confirmed that they spoke frequently about potential acquisitions targets as well as HCI's current fiscal health.  We find it not credible that, irrespective of whether Robertson or Dickerson may have taken the lead on tax payments, that this subject did not arise during their regular briefings of Mr. Gann.  Even straining credulity to assume that it was not raised by either of them, it was, given his level of involvement, Mr. Gann's obligation to inquire given the history of problems earlier faced by HCI in meeting its payroll tax obligations.

### 3.  Documentary Evidence

Mr. Gann signed a great number of checks on behalf of HCI in its ordinary course of business.  The record contains a ledger and copies of 2508 checks signed by Mr. Gann and drawn from HCI's accounts at Sovereign Bank in Dallas.  *See* JX 93.  Most of those checks were executed during the first year of HCI's operation, but some were signed as late as 2007.  These include three checks written in 2006 to the IRS.  Mr. Gann contends that those three fulfilled

---

[13] Although the witnesses frequently referred to Mr. Dickerson as the CFO of HCI, he was  not an employee of the company.  His services were covered by a consulting agreement with HCI, signed by Mr. Dickerson and Mr. Gann, whereby he billed HCI by the hour.  The agreement did, however, list among his services those "associated with duties reasonably expected of a Chief Financial Officer."  JX 54 at 1.  Mr. Dickerson also held the title of CFO of HCI's holding company.  Tr. 76 (Dickerson).

HCI's obligation under the 2005 installment agreement.  The government challenges that assertion on the basis that they were not limited to the installment agreement and thus were properly allocated to meet non-trust fund taxes owed.[14]

The records of the bank accounts in HCI's name reveal that Mr. Gann had signature authority for all of them.  *See* JX 75; JX 76.  There was a checking account earmarked for tax purposes, and Mr. Gann was the sole representative of HCI with signing authority for that account.  JX 75 at 1078-81.  Mr. Dickerson testified that the purpose of that account was to be a repository for payroll taxes, although it was not the only account that could be used for that purpose.  Tr. 176.  On the signature cards for all of the various bank accounts of HCI, Mr. Gann was listed with various titles for HCI.  Most of them reflect the title of "principal."  Other accounts list Mr. Gann as "president, authorized signer, or chairman."  *See* JXs 74-76.  Ms. Robertson is also listed on all of the accounts other than the tax account.  She is listed with various titles: "vice president, authorized signer," and "CEO."  *Id.*

We were also presented at trial with several documents signed by Mr. Gann on behalf of HCI and correspondence with various parties from Mr. Gann for HCI.  We have already cited one: Mr. Dickerson's consulting agreement.  JX 54.  In addition, Mr. Gann signed a workers compensation insurance policy, JX 55, an application for a general insurance policy for HCI, JX 56, and the lease for HCI's corporate offices, JX 57.  The correspondence from Mr. Gann in the record includes two engagement letters from the auditing firm of Farmer, Fuquay & Huff, signed by Mr. Gann for HCI.  JX 69; JX 70.  At least one letter from a law firm representing an individual suing HCI was addressed to Mr. Gann.[15]  JX 71.  The record also contains several November

---

[14] The record contains no documentary indication of an earmark of those funds to meet the installment agreement obligation, but the temporal relationships between those checks and the agreement and the fact that they met or exceeded the installment agreement amount, suggests an intent, consistent with Mr. Gann's testimony, to satisfy the agreement.

[15] The record also contains an earlier letter from another firm regarding the same individual who sued HCI.  That letter is addressed to the attention of "management" at HCI.  JX 67.  Although this document was not addressed to

(continued...)

2006 emails to and from Mr. Gann concerning a business dispute with a company that denied contracting for HCI's services.  DX 10.  Lastly, shortly before the end of HCI, Mr. Gann also signed a letter from HCI to Textron, HCI's payroll factor, concerning an attempt to sell HCI's assets in 2007.  Tr. 73.

The record also contains two SEC filings, both dated March 22, 2006, in which payroll tax liability in the amount of $74,119 is specifically called out as owing for the fourth quarter of 2005, a period subsequent to Mr. Gann's installment agreement with the IRS.  The first is a form 8-K filed as a result of HCI's acquisition by the holding company.  JX 34.  Mr. Gann testified that he reviewed this form.  Tr. 463.  The second is a Form 10-K, annual report for HCI's parent company, which was signed by Mr. Gann.  JX 35.  Both documents contain this proviso: "Currently we are delinquent with respect to these federal payroll tax liabilities." JX 34 at 1953; JX 35 at 1899.  Mr. Gann also remembered during his testimony that he reviewed the financial information contained in other quarterly SEC filings, which showed mounting liabilities but did not separately break out payroll taxes.  Tr. 375.  During cross examination, when asked specifically about the 10-Q forms for the quarters ending September 30, 2005 (JX 36), December 31, 2005 (JX 37), and March 31, 2006 (JX 40), he could not recall whether he reviewed those documents before or after filing, but he was sure that he reviewed them at some point.

4.  Report of IRS Interview

When Revenue Agent Nick Tsirigotis visited HCI's offices on February 22, 2007, he interviewed Mr. Gann concerning his role at HCI.  He kept a record of that interview on an IRS Form 4180, consistent with standard IRS procedure.[16]  The form reflects that Mr. Gann represented himself as an "investor/board member" of HCI.  DX 2 at 253.  Mr. Gann is listed again as a board member in a list of relevant persons with information about HCI's operations, and Ms. Robertson is listed underneath him as the CEO.  *Id.* at 254.  Mr. Dickerson is listed in a separate section for other knowledgeable

---

[15](...continued)
Mr. Gann, the fact that later correspondence regarding the lawsuit is addressed to him is telling.

[16] This form is titled "Report of Interview with Individual Relative to Trust Fund Recovery Penalty or Personal Liability for Excise Taxes."

individuals. Under a section entitled "Responsibility," Mr. Gann is represented by a "yes" checkmark for the following activities of HCI: determining financial policy; directing and authorizing the payment of bills; opening and closing bank accounts; guaranteeing loans; signing checks; authorizing or signing payroll; authorizing or making federal tax deposits; and preparing, reviewing, signing, and transmitting payroll tax returns. *Id.* at 255. Ms. Robertson is also listed as someone performing all of these roles for HCI other than guaranteeing loans.

In the section regarding the use of the Electronic Federal Tax Payment System for making tax deposits, Karen Stone is listed as the person assigned the PIN and passwords for that system. *Id.* The record of interview reflects, however, that Form 941, quarterly tax returns, were not filed electronically. Mr. Gann and Ms. Robertson are listed as authorized signers.[17] *Id.*

On the next page of the record of interview, Mr. Gann is recorded as learning of the delinquent trust fund taxes in November 2005. When questioned as to what actions he took to fix the problem, the answer recorded is, "terminated the bookkeeper" and "paid taxes as funds were available." *Id.* at 256. Mr. Gann is listed along with Ms. Robertson, Mr. Dickerson and Karen Stone as individuals who had contact and handled correspondence with the IRS.

The next question on the form asks, "during the time the delinquent taxes were increasing, or at any time thereafter, were any financial obligations of the business paid?" The answer is "yes" and "all bills were paid," as authorized by Mr. Gann and Ms. Robertson. *Id.*

Farmer, Fuquay & Huff were listed as outside accountants, and Mr. Gann is recorded on the form as having discussions with them regarding the finances of the company. Mr. Tsirigotis also recorded, based on Mr. Gann's answers, that HCI internally generated monthly financial statements, which were reviewed by plaintiff and Ms. Robertson. *Id.*

In the section entitled Continuation of Answers/Additional Comments appears the notation "will comment later" in Mr. Gann's handwriting. *Id.* at

---

[17] We note that Mr. Gann did not sign any of the tax returns at issue. Those were signed by Ms. Robertson

257.  The form is then signed by Mr. Gann underneath the statement that "I declare that I have examined the information given in this interview and to the best of my knowledge and belief, it is true, correct, and complete." *Id.*  Mr. Gann testified at trial, however, that he was never subsequently asked to provide those comments and that he only signed the form because Mr. Tsirigotis insisted that he would not leave the interview until Mr. Gann signed it.  Tr. 493.  Plaintiff thus takes issue with most of the information contained in this form.

Mr. Gann was asked about the form and the interview during cross examination by defendant.  He testified that he did not approve of the way that Mr. Tsirigotis was filling out the form during his interview, which is why he wrote "will comment later" before he signed it.[18]  When asked about the yes/no list of responsibilities that reflect affirmative answers for those activities, such as authorizing bills and making tax deposits, Mr. Gann testified that he "disagree[d] with this whole form" and explained that he wrote "will comment later" because he "didn't like it."  Tr. 496.  When asked whether he ever attempted to amend his answers or correct the record after the fact, Mr. Gann said that he did not because he was too involved in trying to sell HCI at the direction of the IRS.  *See* Tr. 493.  He repeated his line that he wrote "will comment later" when asked about several other pieces of information contained in the form as well.  *See* Tr. 496-97.  He did not, however, further elaborate regarding what specifically he disagreed with in those answers in the record of the interview.

Mr. Tsirigotis was asked about Mr. Gann's interview responses during trial.  He stated that he recorded the answers as given by Mr. Gann and that he would have made the form available to Mr. Gann "at any time" to update his answers, but that he was never asked to do so.  Tr. 857.  He also stated that he gave Mr. Gann the opportunity to review the record of the interview before signing it and that the only changes that Mr. Gann made before signing were 1) to the date of when he became aware of the tax liability (from September 2005 to November 2005) and 2) his notation that he would comment later.  Tr. 859.  He also testified that Mr. Gann was not forced to sign the form and that there was no legal consequence if he did not.

---

[18] The document admitted at trial also contains a number of marginalia written in red ink, apparently after the fact.  No witness was asked about them, and thus we do not consider them in our review of the evidence.

We credit the information appearing in the Form 4180 as accurate. Plaintiff had the opportunity to amend his answers or provide further comment and chose not to do so.  Mr. Tsirigotis' testimony that he simply recorded the answers as provided by Mr. Gann was unequivocal and credible, unlike Mr. Gann's assertion that Mr. Tsirigotis forced him to sign.  The substance of the interview record confirms much of the testimony that we heard from Ms. Robertson and others and the documentary evidence received at trial–Mr. Gann was regularly involved in the running of the company, had control of the finances, was kept informed about the companies financial health at least monthly, and was more likely than not knowledgeable about either the tax delinquency in fact or had reason to know of it but ignored the possibility.  At a minimum, plaintiff has not met his burden of proving that he was not reckless in disregarding the possibility of unpaid payroll taxes after November 2005.

B.  Ms. Robertson's Involvement Does Not Minimize Mr. Gann's Role

Ms. Robertson had the title of CEO of HCI.  She testified, however, that this was a position in-name-only.  Instead, according to her testimony, she was a glorified saleswoman under constant pressure to out perform HCI's cash flow problems.  In fact, she recalled that her initial title at HCI was Vice President of Sales.  Tr. 555.  That title changed to President at some point later.  She was asked when that change took place.  Her answer:

A:  I can't tell you exactly.  I know that . . . the intention was for Andy Wimpee and Charlie [Dickerson] to . . . run the office, and I was supposed to go get the sales. . . . [S]o when Andy Wimpee didn't show up to  work, because he–I guess he was asking for too much money, then that position was not being filled, and so I guess that's why they put me in that position.

Q:  Did you have an understanding of what your job responsibilities were in the position of . . . president or CEO?

A: No.  I did not know my job titles.  All I know is what I was told, and I was told to go get the sales for the company.  And that's what I did.

Tr. 556.  While Mr. Gann testified that it was Ms. Robertson who proposed that she take the position of CEO after it was apparent that Mr. Wimpee would

not be joining them, Tr. 254, we are persuaded that her shading of events in this regard was less inaccurate than his.

Ms. Robertson further testified that Mr. Gann was at HCI almost daily and that he and Mr. Dickerson ran the company. She recalled frequent meetings between the two at which she was not present. She was simply instructed to sell staffing contracts. She also testified that Mr. Dickerson was the primary supervisor over the bookkeeping staff. Tr. 566. The initial bookkeeper for HCI was an acquaintance of Ms. Robertson from her former job. That bookkeeper was quickly replaced by a friend of Mr. Dickerson, Karen Stone. Ms. Robertson testified that it was Ms. Stone, along with the officer manager, Delia Trevino, who prepared the payroll for the temporary employees. Tr. 567. Ms. Robertson testified that she was not involved in preparing payroll nor tax returns, and she did not have any access to the accounting software at HCI. Tr. 567-68.

We do not believe that is an entirely accurate portrayal of Ms. Robertson's role at HCI nor of her knowledge of the tax situation, but it matters little given what we have already found with regard to Mr. Gann's involvement at HCI. Based on Mr. Tsirigotis' testimony, we know that Ms. Robertson was present during the meeting at HCI with Mr. Tsirigotis along with Mr. Gann and Mr. Dickerson on February 14, 2016. The court inquired regarding her role at that meeting. Mr. Tsirigotis confirmed that it was a speaking one and that she would chime in whenever she felt comfortable with the subject of the question. *See* Tr. 843, 845. One such subject was the payment of taxes and whether returns had been filed. "Whenever I would ask questions regarding payment of the taxes or whether or not returns . . . had been filed, she would answer." Tr. 843 (speaking of Ms. Robertson). Later, when asked to further describe who was knowledgeable about what subject matter, Mr. Tsirigotis stated:

> Questions relating to the basic operations of the business and all, as far as maybe payments, may have been Ms. Robertson. Mr. Dickerson seemed to have some knowledge of that as well. And Mr. Gann seemed to be more responsive to overall company financial situations and what the basic finances of the company all were and how they were going.

Tr. 845.

This contradicts defendant's notion that Ms. Robertson was an innocent bystander at HCI.  We credit Mr. Tsirigotis testimony as wholly reliable.  He is the only witness, other than Mr. Huff, without any personal interest in the outcome of the IRS' investigation into who was responsible for the nonpayment of the withheld trust fund taxes.

Although at trial we did not hear a clear story of who precisely handled what duties on a daily basis at HCI and particularly who was responsible for not paying over the trust fund taxes to the government, we are content with the conclusion that there is shared blame between Ms. Robertson and Mr. Gann. In sum, we find that her testimony was not entirely truthful regarding her role vis-a-vis the payment of payroll taxes at HCI.  That does not mean, however, that Mr. Gann was uninvolved.  Although she attempted to inaccurately minimize her own involvement with the tax issue during her testimony, and her role at HCI generally, we find that her testimony otherwise generally supports the documents in evidence and the notes and testimony of Mr. Tsirigotis that Mr. Gann had a regular role in the management of HCI and control over its finances.

C.  Charlie Dickerson's Testimony With Regard to Ignorance of Tax Problem is Not Credible

Given much of what is found above, we do not believe Mr. Dickerson was wholly truthful when he testified that he was unaware of the growing payroll tax problem, nor is it likely that he never discussed the issue with Mr. Gann.  His testimony that he was uninvolved with the preparation of tax returns is directly controverted by the Form 941 quarterly return for the quarter ended on June 30, 2005, which bears his handwriting and on which he is listed as a third-party designee.  JX 22 at 251; Tr. 153 (confirming that his handwriting appears on the exhibit).  He was also presented at trial with his deposition testimony in which confirmed that he had knowledge of the problem at the time because it was obvious from HCI's financial records.  Tr. 193-94.

It is not disputed that Mr. Dickerson regularly prepared financial reports and statements and provided them to potential investors and to Mr. Gann himself.  Mr. Huff confirmed that payroll tax liabilities were a component of accounts payable on several such reports in evidence.  Mr. Dickerson is a licensed CPA.  He knew or had reason to know what that line indicated on the reports that he generated.  Mr. Dickerson was a veteran of the staffing

industry, an industry in which payroll taxes represent perhaps the single greatest liability on a company's balance sheet. He may have believed HCI's problem to be relatively unimportant given Mr. Gann's plan to take the company public and thereby generate a large infusion of capital, but a claim of ignorance of the liability on the part of a CPA who set up HCI's accounting systems is not credible. Further, Mr. Gann and Mr. Dickerson met at least monthly to discuss the overall general financial health of HCI. That HCI's growing negative balances was a topic unexplored during these meetings is simply too incredible to be believed. We find, therefore, that Mr. Dickerson knew about the growing payroll tax liability and that he almost certainly discussed it with Mr. Gann.

This further bolsters our conclusion with regard to Mr. Gann. In light of his role at HCI and regular briefings from Mr. Dickerson, he knew, or should have known, of the growing tax liability from November 2005 through the end of HCI in September 2007. Mr. Dickerson's story of his ignorance is not credible and Ms. Robertson's own involvement in the management in HCI does not lessen Mr. Gann's knowledge, or the fact that he ample reason to inquire, of the tax problem.

II.  Mr. Gann Was Grossly Negligent of a Known Risk

These findings lead us to the inescapable conclusion that, at a minimum, Mr. Gann recklessly disregarded a known risk of non-payment of trust fund taxes to the IRS for the period of the fourth quarter of 2005 through the third quarter of 2007.

A.  Plaintiff Knew that HCI Had Failed to Pay Taxes in 2005

There is no dispute that, as of November 2005, plaintiff was aware that HCI had previously failed to pay over all of the withheld taxes to the IRS in 2005. After Ms. Robertson approached him with a letter from the IRS, he promptly attempted to fix that problem by entering an installment agreement with the IRS. He also personally saw to it that checks were delivered to the IRS to fulfil that agreement. His testimony and actions make clear that he was quite concerned with the issue of non-payment of taxes. Thus, the idea that he and Mr. Dickerson then forgot the issue until Mr. Tsirigotis appeared on the scene in 2007 is unbelievable. But, even assuming that were true, it was grossly negligent.

24

B. He had Reason to Know that There Was a Continuing Problem

Mr. Gann's testimony was replete with examples of his savvy in financial matters. He painted a picture in which his management of HCI, even if it was generally high-level, was personal and swift when he was presented with a problem. When HCI was unable to get credit at its inception, he fronted the money or signed the contracts in a personal capacity to get the company running. When the company immediately required money to continuing operating, he provided it. When the IRS sent a notice of a tax liability to HCI in November 2005, Mr. Gann personally called the IRS to resolve the issue. He signed hundreds of checks on behalf of HCI and was generally aware of what sort of liabilities the company had.

Mr. Gann had an office located at HCI and was frequently there. He had at least weekly meetings with Mr. Dickerson. At least monthly they discussed the financial state of HCI. Mr. Dickerson had every reason to know of the tax problem and we find that he did. It is thus more likely than not that he discussed the tax liability with Mr. Gann. Mr. Gann also frequently met with Ms. Robertson to discuss her sales and bills that needed to be paid. Regardless of who presented the bills to whom, Mr. Gann was thus aware of outstanding liabilities that needed to be met. Payroll taxes were one such liability.

Even crediting the implausible–that Mr. Gann chose not to be involved in payment of taxes and was ignorant of the facts—he had every reason to inquire about the taxes after 2005. He was aware that they had not been paid in full in 2005. He knew that they were owed every quarter. Given his level of involvement in the running of HCI and his ongoing knowledge of its financial state, it was grossly negligent for him to have ignored the possibility that this obligation not be met again.

As mentioned earlier, two particular SEC documents that Mr. Gann was knowledgeable of specifically called out almost $75,000 in delinquent payroll taxes for the fourth quarter of 2005. In addition, further quarterly reports of HCI's parent company show mounting liabilities, which included payroll taxes. Given Mr. Gann's personal financial savvy, his regular involvement in the company, and regular financial briefings from Mr. Dickerson, it is likely that he knew that a portion of those growing sums represented owed payroll taxes. This contradicts the idea that Mr. Gann was unaware, after November 2005, of any continuing failure to pay over withheld trust fund taxes to the IRS.

Given his signature and review of these documents, it was reckless of him to have ignored this problem afterwards.

Plaintiff attempted to explain away these filings in its post-trial briefs by arguing that, given Mr. Gann's then-recent installment agreement with the IRS, he would not have thought the delinquent taxes a problem and would not have had reason to later inquire about payroll taxes. We reject that notion as unsupported if only for the simple fact of the amount showing as owing. Mr. Gann's testimony was that the 2005 agreement with the IRS was for an amount of roughly $32,000. An amount over double that appearing as owing only one quarter later should have, at a minimum, given him ample reason to inquire.

We also cannot credit the idea that replacing a bookkeeper in late 2005 or early 2006 absolved him of the responsibility to inquire about the payroll taxes going forward. Mr. Gann was involved in the regular operations of the company and made himself frequently aware of what money was coming in, what was going out, and what bills needed to be paid. Even if he was not specifically aware of a particular failure to pay taxes for a particular quarter, that ignorance was willful as evidenced by HCI's prior problems, his level of involvement in the company, and specific knowledge of problem in the fourth quarter of 2005 (as evidenced by the two SEC documents cited above).

C.  Mr. Tsirigotis Did Not Direct HCI Not To Pay its Taxes in 2007

With regard to the trust fund taxes not paid during the period in February 2007 through the end of HCI in September 2007, it is undisputed that Mr. Gann failed to take steps to insure that those were paid. He can neither feign ignorance nor pass the buck to Ms. Robertson. The IRS was on the scene and the problem was acute. Plaintiff's quasi-equitable defense that he and HCI were operating with the IRS' blessing, thus implicitly approving of the non-payment of payroll taxes during this period, is a non-starter.

No witness testified that Mr. Tsirigotis or anyone else from the government advised anyone at HCI, neither explicitly nor implicitly, that they need not pay HCI's ongoing payroll taxes in 2007. That Mr. Gann and Mr. Dickerson may have somehow believed that is no defense. Certainly they were more focused on finding a buyer for HCI and a way out of the mess that HCI was in, but that is also not a defense. The failure to pay all of HCI's payroll taxes was a known problem. Mr. Gann was not told by the IRS that HCI could

26

ignore its current duty to pay over withheld monies to the IRS.[19] Mr. Tsirigotis confirmed that he informed Mr. Gann and Ms. Robertson of the opposite on multiple occasions.  The failure to pay during this period was thus willful because, at a minimum, it was grossly negligent of Mr. Gann to have ignored the duty to pay during this period.

   D.  Mr. Gann Was Not Wilful for the Second and Third Quarters of 2005

   There is one exception to our holding above: the second and third quarters of 2005.   Mr. Gann entered an installment agreement with the IRS in November 2005 to cover the liability during this period.   Although Mr. Tsirigotis explained why, from the IRS's vantage point, those quarters were not fully met by HCI's subsequent payments, we are not persuaded that Mr. Gann wilfully failed to make those payments nor that he recklessly disregarded a risk of non-payment.

   Plaintiff testified that he personally saw to it that three checks were delivered to the IRS.  The record contains copies of three checks to the IRS signed by Mr. Gann.  Those checks total $35,000, more than the agreed to amount of the installment agreement.  Due to the subsequent failure to pay all of its trust fund tax obligations, those payments may not have been applied by the IRS to periods covered by the installment agreement, but we are persuaded that Mr. Gann believed that obligation was met by early 2006.  We are thus not prepared to find that he was negligent as to these periods given his testimony that he took steps to pay these taxes.[20]

_____

[19] Plaintiff also made the argument in his post-trial papers that Mr. Tsirigotis incorrectly advised Mr. Gann that HCI could not designate a voluntary payment to be applied first to trust fund tax liabilities.  In plaintiff's view, Mr. Gann was discouraged from earlier liquidating HCI and voluntarily applying the proceeds to trust fund tax penalty amounts.  The only proper remedy, says plaintiff, is an abatement of those penalties.  This defense, even if it were cognizable in this court, was waived.  It was neither pled in the complaint nor raised in the pre-trial briefing.  In any event, the factual predicate–that Mr. Tsirigotis made such representations–was not established at trial.

[20] Nor can we say that he was later aware of the failure to pay for these quarters and then failed to use all unencumbered funds to meet the obligation.
(continued...)

<u>CONCLUSION</u>

Because plaintiff recklessly disregarded an obvious and known risk that trust fund taxes would not be paid over to the IRS, he is liable under 26 U.S.C. § 6672 for the penalty amounts assessed against him for the tax quarters beginning with the fourth quarter of 2005 through the third quarter of 2007. Defendant requested at oral argument that, if we found liability, the parties be allowed to consult and propose an amount of judgment pursuant to our factual findings.  Accordingly, the parties are directed to file a joint status report on or before October 6, 2016, detailing the amount for judgment, if agreed upon, against plaintiff on the government's counterclaim.

<u>s/Eric G. Bruggink</u>
ERIC G. BRUGGINK
Senior Judge

---

[20](...continued)
Given the installment agreement, we find that he was unaware, after November 2005, of any failure to meet HCI's trust fund tax liability for the second and third quarters of 2005.

28